## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **QUINN F. SCOTT, et al.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **BIMBO BAKERIES, USA, INC., and** | : | **No. 10-3154** |
| **BIMBO FOODS BAKERIES, INC.** | : | |

**Goldberg, J.**                                                    **February 29, 2012**

### MEMORANDUM OPINION

This case raises several issues under the Fair Labor Standards Act ("FLSA") and related Pennsylvania statutes. Plaintiffs, Quinn F. Scott, Ronald Sochacki, William J. Davenport, III, Robert Dando, Sr., Kevin Kazarnowicz,[1] on behalf of themselves and all others similarly situated ("Plaintiffs"), initiated this lawsuit against Defendants, Bimbo Bakeries USA, Inc. and Bimbo Foods Bakeries, Inc. ("Defendants") for alleged violations of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 PA. CON. STAT. §§ 260.1 et seq. (Count I), the Pennsylvania Minimum Wage Act ("PMWA"), 43 PA. CON. STAT. §§ 333.101 et seq. (Count II), the FLSA, 29 U.S.C. §§ 201 et seq. (Counts III), and for negligent misrepresentation (Count IV).

Before the Court are Defendants' Motion to Dismiss and Plaintiffs' Motion for Approval of Notice to Potential Class Members.  (Doc. Nos. 7, 9.)  For the following reasons, Defendants' Motion will be granted in part and denied in part, and Plaintiffs' Motion will be granted.

---

[1] Although Plaintiff is referred to as both "Kazarnowicz" and "Kazornowicz" in the pleadings and briefs, we will refer to him as "Kazarnowicz" for the sake of simplicity.  See (Doc. No. 44, Ex. Q) (reflecting that this is the spelling used in his deposition).

1

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs deliver fresh baked goods for Defendants nationwide, pursuant to Distribution Agreements that identify them as "independent contractors." Plaintiffs allege that, although they are classified as "independent contractors," Defendants control and manage their work and thereby treat them as their "employees." Under Defendants' alleged "nationwide policy" of mis-classifying their drivers in this manner, Plaintiffs contend that they were denied certain rights, privileges, and benefits owed to "employees" under the law. (Am. Compl. ¶¶ 21, 28-48.)

More specifically, Plaintiffs' amended complaint alleges that:

-       There are "unwritten policies" that Plaintiffs are expected to follow, which "govern the ordering of product, frequency of deliveries and manner of store service," id. ¶ 35;

-       Defendants "employ supervisors and managers . . . who have extensive supervisory and disciplinary control over the class members," and that "Defendants unilaterally increase or decrease orders placed by the Plaintiffs with or without prior notice," id. ¶¶ 37, 44-45;

-       Defendants "unilaterally determine which fresh baked good[s] products are available for purchase," and prohibit Plaintiffs from delivering baked goods which are in direct competition with their products, id. ¶¶ 46-47;

-       Defendants make "unauthorized deductions" from their pay and require them to cover "operation expenses," which reduces their salary below the federal minimum wage, id. ¶¶ 63-67; and

-       They are "required to work in excess of 40 hours per week without overtime pay. Specifically, Plaintiffs allege they regularly work from approximately 3:00AM - 1:00PM five days per week in addition to 2-3 hours on Sundays . . . . [and] an extra half-hour every evening placing orders and adjusting orders." Id. ¶ 59.

On October 1, 2010, Defendants filed a motion to dismiss Plaintiffs' amended complaint. (Doc. No. 7.) On October 9, 2010, Plaintiffs filed a Motion for Approval of Notice to Potential Class Members, requesting that we conditionally certify this case as a collective action under the

FLSA.  (Doc. No. 9.)  In response, Defendants requested leave to perform limited discovery to determine whether conditional certification was appropriate.  We granted this request and the parties engaged in limited discovery pursuant to a joint discovery plan, which included depositions of named Plaintiffs and certain opt-in Plaintiffs, as well as targeted interrogatories and document requests.  On October 3, 2012, after completion of this discovery period and supplemental briefing, we held oral argument on Plaintiffs' Motion.

Defendants' motion to dismiss and Plaintiffs' motion for conditional certification are now fully briefed and ready for disposition.

## II.   DEFENDANTS' MOTION TO DISMISS

### A.   Standard of Review

When considering a motion to dismiss, the court must assume the veracity of well-pleaded factual allegations, construe them in a light most favorable to the plaintiff, and "then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009).  The court may only look to the facts alleged in the complaint and its attachments when deciding a motion to dismiss.  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).  "'[B]are-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.2009) (quoting Iqbal, 129 S.Ct. at 1949).

B.     **Discussion**

Defendants seek dismissal of each of Plaintiffs' claims, arguing that they failed to state

claims for relief under the FLSA, PMWA, WPCL, and the Pennsylvania common law cause of

action for negligent misrepresentation.[2]  We will address each argument in turn.

1.     **Plaintiffs' Claims Under the FLSA**

The FLSA requires employers to pay employees "engaged in commerce" no less than the

federal minimum wage, 29 U.S.C. § 206(a), and to provide them overtime compensation for each

hour worked beyond 40 hours a week.  29 U.S.C. § 207(a)(1).  To state a claim under the FLSA for

minimum wage and overtime compensation, plaintiffs must allege: (1) they are employees of the

defendant; (2) that their "work involved some kind of interstate activity[;]" and (3) the approximate

number of hours worked for which they did not receive these wages.  See Zhong v. August August

Corp., 498 F.Supp.2d 625, 628 (S.D. N.Y. 2007).  In addition, where plaintiffs brings suit on behalf

of themselves and those similarly situated, "the complaint should indicate who those other

---

[2] Defendants also assert that Plaintiffs' complaint should be dismissed because they sued
Bimbo Bakeries USA and Bimbo Food Distribution, Inc., rather than the "proper" defendant,
Bimbo Foods Bakeries Distribution, Inc. (BFBD).  (Defs.' Mot. at 5-6.)  In response, Plaintiffs
contend that Bimbo Bakeries USA is a proper defendant, as it is their de facto employer and the
parent company of BFBD.  Plaintiff also asserts that they mistakenly named Bimbo Food
Distribution, Inc., rather than BFBD.  (Pls.' Resp. 4-5.)  Given Plaintiffs allegations regarding
Bimbo Bakeries USA's control and direction over their work, at this stage of the proceeding that
entity will remain a Defendant in this case.  "Liability for violating an employee's rights under
FLSA has attached to a parent corporation for the acts of a subsidiary when the parent
substantially controls the terms and conditions of employment at its subsidiary on a regular
basis."  Lehman v. Legg Mason, Inc., 532 F.Supp.2d 726, 733 (M.D.Pa. 2007); Zavala v. Wal-
Mart Stores, Inc., 393 F.Supp.2d 295, 325-26 (D.N.J. 2005) (rejecting argument that plaintiff
sued wrong party, because there were sufficient facts alleged to support an employment
relationship between plaintiff and named plaintiff under broad FLSA standards).  As to Plaintiffs
failure to properly identify BFBD, this error has not resulted in any prejudice, as BFBD is clearly
on notice of this litigation.  Further this error may be cured by an amendment to substitute or add
a defendant.

employees are, and allege facts that would entitle them to relief." Id.

Defendants argue that Plaintiffs' complaint does not contain sufficient facts to suggest that their compensation fell below the minimum wage or applicable overtime rate, as is required under the third element of the FLSA standard.[3]  The United States Court of Appeals for the Third Circuit has not addressed how precisely a plaintiff must plead the third element of an FLSA claim and district courts are split on this question.  While some district courts simply require plaintiffs to allege that they did not receive overtime or minimum wage payments,[4] others apply a more stringent standard and require plaintiffs to allege the approximate number of hours for which they did not receive such payments.[5]

---

[3] Defendants do not challenge the sufficiency of Plaintiffs' allegations regarding their status as "employees," rather than "independent contractors."  See (Defs.' Mot. at 15-18.)

[4] See e.g., Uribe v. Mainland Nursery, Inc., 2007 WL 4356609 at *3 (E.D.Cal. Dec. 11, 2007) (denying motion to dismiss where plaintiffs alleged they were "non-exempt employees for a wholesaler of plants who have not been paid the applicable overtime wages under the FLSA"); Xavier v. Belfor, USA Group, Inc., 2009 WL 411559 at *5 (E.D.La. Feb. 13, 2009) (denying motion to dismiss where plaintiff alleged that "they were paid on an hourly basis, that they routinely worked in excess of 40 hours per week, and that they were not paid an overtime premium").

[5] See e.g., Jones v. Carsey's Gen. Stores, 538 F.Supp.2d 1094, 1102 (S.D.Iowa 2008) (granting motion to dismiss where plaintiffs alleged that they "regularly worked regular time and overtime," but were not paid minimum wage or overtime, because they failed to approximate the number of hours for which they are entitled to minimum wage or overtime); Villegas v. J.P. Morgan Chase & Co., 2009 WL 605833 at *5 (N.D.Cal. Mar. 9, 2009) (granting motion to dismiss where plaintiff "attempt[ed] to state a claim by reciting that she did not receive properly computed overtime wages . . . . because it is not much more informative than an allegation that she was not paid for overtime work in general"); Bailey v. Border Foods, Inc., 2009 WL 3248305 at *2 (D.Minn. Oct. 6, 2009) (granting motion to dismiss where plaintiff "failed to identify their hourly pay rates, the amount of their per-delivery reimbursements, the amounts generally expended in delivering pizzas, or any fact that would permit the Court to infer that [plaintiffs] actually received less than minimum wage").

Viewing the alleged facts in a light most favorable to Plaintiffs, we conclude that a plausible FLSA claim has been pled, even under the more stringent pleading standard.  Plaintiffs allege that they "were regularly paid less than the federal minimum wage that applied during the applicable limitations period by Defendants as payment for hours worked."   In support of this allegation, Plaintiffs point to "numerous and various deductions" associated with "the delivery of the fresh baked goods" that allegedly caused their "wages to fall below minimum wage[,]" including "lease payments in regards to the truck lease, lease payments for computer equipment, insurance, the cost of returned 'off code' baked goods, the cost of servicing a sales area at its own direction and penalties or fees assessed by retail outlets[.]"  (Am. Compl. ¶¶ 32, 52.)

Plaintiffs also allege that they "regularly worked more than 40 hours per week, but did not receive overtime pay.  Specifically, Plaintiffs regularly work from approximately 3:00 AM – 1:00 PM five days per week in addition to 2-3 hours on Sundays resulting in well over 40 hours per week.  [Plaintiffs also] spend an extra half-hour every evening placing orders and adjusting orders.  At no time were Plaintiffs ever paid an hourly wage or time and one half for overtime hours worked." (Am. Compl. ¶¶ 59, 98-100.)

Viewed in a light favorable to Plaintiff, their allegations reflect that they worked approximately 55 hours per week and that their compensation, which is not based on an hourly wage, fell below the federal minimum wage due to "deductions" and operational costs that they were required to assume.  Although Plaintiffs do not include an actual calculation of their average hourly rate of pay, we conclude that such specificity is unnecessary at this stage.  Plaintiffs allegations regarding their work schedule and a list of the "deductions" that allegedly reduced their compensation below the applicable minimum wage and overtime pay are more than sufficient to

support a plausible FLSA claim and will allow Defendants to formulate a defense.[6]

Defendants also contend that Plaintiffs have failed to allege facts which indicate that the other "similarly situated" Plaintiffs are entitled to relief under the FLSA.  We disagree.  Plaintiffs have presented this case as a collective action on behalf of other individuals who were "designated by Defendants as 'independent contractors' and/or 'independent operators' whom pick-up fresh baked goods from Mt. Laurel, New Jersey depot for delivery in Pennsylvania and New Jersey from 2007 to the present . . . and/or 'independent operators' nationwide from 2007 to the present."  Plaintiffs claim that there are "over 30 class members in a depot located in Mt. Laurel, New Jersey" as well as "over several thousand" nationwide.  Plaintiffs also provide that the allegations set forth in support of their claim apply to the potential class of similarly situated individuals and that each potential plaintiff was subject to the "uniform policies of Defendants" and "the same or substantially similar 'Distribution Agreement.'" (Am. Comp. ¶¶ 3, 16, 18-21.)

Viewing the alleged facts in a light most favorable to Plaintiffs, we conclude that they have identified the other potential class members with sufficient specificity and alleged facts that would entitle these individuals to relief.  See Zhong v. August August Corp., 498 F.Supp.2d 625, 628, 631 (S.D.N.Y. 2007) (holding that to allege collective action, plaintiffs must provide allegations that identify the class of "similarly situated" plaintiffs and suggest that they are entitled to relief).

---

[6]  See Arnold v. DirectTV, et al., 2011 WL 839636 at **1-2 (E.D.Mo. Mar. 7, 2011) (rejecting position that a complaint must set forth details "such as . . . hourly pay rate" to sustain minimum wage and overtime claims, and denying motion to dismiss because plaintiffs, rather than merely stating "legal conclusions[,]" alleged that defendant had a policy of "not compensating" plaintiffs in certain circumstances and withholding pay when customers complained).  Cf. Killian v. McCulloch, 850 F.Supp. 1239, 1255 (E.D.Pa. 1994) (motion to dismiss granted where plaintiffs did not allege who was owed wages, the period for which wages were owed, or what "other benefits" they were entitled in support of a WPCL claim).

### 2.      Plaintiffs' Claim Under the PMWA

Defendants further assert that Plaintiffs fail to state a plausible claim under the PMWA. However, Defendants acknowledge in their motion that the "general overtime pay requirement of the PMWA is substantively indistinguishable from that of the FLSA," and "Pennsylvania law substantially incorporates the standards and definitions of the FLSA."  Because Plaintiffs have pled a plausible FLSA claim, we conclude that they have also pled a plausible PMWA claim.[7]

### 3.      Plaintiffs' Claim Under the WPCL

The Pennsylvania Supreme Court has stated that "[t]he Wage Payment and Collection Law provides employees a statutory remedy to recover wages and other benefits that are contractually due to them."  Oberneder v. Link Computer Corp., 696 A.2d 148, 150 (Pa. 1997) (citing Killian v. McCulloch, 850 F.Supp. 1239, 1255 (E.D. Pa. 1994)).  "Accordingly, a prerequisite for relief under the WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid. . . .  Relief under the WPCL is implausible without existence of a contract."  Lehman v.

---

[7] Defendants also argue that the FLSA "impliedly preempts" Plaintiffs' PMWA claim, to the extent they seek to bring their PMWA claim as a class action under Federal Rule of Civil Procedure 23.  Defendants contend that it would undermine the FLSA's collective action procedure – which requires plaintiffs to "opt-in" to the litigation – to allow plaintiffs to bring similar state law claims under the "opt-out" class action procedure that applies under Rule 23.  In addition, they assert that this "incompatibility" is further highlighted by the fact that a decision on the merits of the PMWA claims would preclude "absent class members" from later asserting their rights under the FLSA, pursuant to "principles of res judicata and collateral estoppel[.]"  See (Defs.' Mot. at 8-11.)

Presently, Plaintiffs only seek conditional certification for their FLSA claim, not class certification of their PMWA claims. Therefore, Defendants' preemption arguments are premature.  In addition, the decision of several circuit courts to permit FLSA collective actions and state law class actions to proceed concurrently in spite of different opt-in and opt-out procedures significantly undermines Defendants' position.  These cases are discussed infra, wherein we consider whether it is appropriate to exercise supplemental jurisdiction over Plaintiffs' PMWA claims.  See infra, Section IV.

Legg Mason, Inc., 532 F.Supp.2d 726, 733 (M.D. Pa. 2007).  The "WPCL does not create a right to compensation.  Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages.  The contract between the parties governs in determining whether specific wages are earned."  Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990); Laborers Combined Funds v. Mattei, 518 A.2d 1296, 1298 (Pa. 1986).

Defendants argue that Plaintiffs fail to state a plausible claim under the WPCL because their allegations are not based on the breach of a "contractual obligation."  Plaintiffs acknowledge that a WPCL claim must be predicated on a contract between the parties for wages, and point to § 3.5 of the "Distribution Agreement," which states:

> In cases where the DISTRIBUTOR sells and distributes Products to Chains or Outlets, which have been approved by [George Weston Bakeries Distribution, Inc. (GWBD)[8]] for credit, GWBD or its affiliates shall, at the request and for the convenience of DISTRIBUTOR, purchase properly filled out and executed charge slips and/or invoices from the DISTRIBUTOR at their face value, and credit DISTRIBUTOR'S account therefor.  DISTRIBUTOR shall promptly remit all such necessary documentation to GWBD and sign such assignments and agreements as may be necessary to transfer to GWBD all receivables and accounts.  If a Chain elects to pay for purchases of product on a scan, rather than delivery basis, GWBD or its affiliates shall purchase the receivable from DISTRIBUTOR at the full face value of the scan report.

For several reasons, we agree with Defendants that Plaintiffs' WPCL claim must be dismissed.

First, Plaintiffs' amended complaint references § 6.3 of the Distribution Agreement and not § 3.5 referenced above.  In fact, Plaintiffs reference to § 3.5 as "a basis for payment" has only been raised by Plaintiffs in response to Defendants' motion.  (Pls.' Resp. at 4.)  Nonetheless, even if § 3.5 was referenced in the amended complaint, nothing in that language pertains to a contract for wages.

---

[8] Plaintiff contends that Defendant, Bimbo Foods Bakeries Distribution, Inc., purchased GWBD and is a successor in interest to this entity.  (Pls.' Resp. at 4.)

Further, even if § 3.5 of the Distribution Agreement was a proper basis for a WPCL claim in this case, Plaintiffs do not provide any allegations that suggest Defendants failed to purchase properly executed "charge slips" or "invoices" or that Defendants failed to "credit" Plaintiffs' accounts for such payment.  Without any allegations to suggest that Defendants breached this, or any other, "contractual obligation to pay earned wages[,]" Plaintiffs have failed to plead a plausible WPCL claim.  Plaintiffs alleged entitlement to minimum wage and overtime payments is based on federal and state statutory provisions, not the contract at issue, and therefore does not provide a basis to proceed under the WPCL.[9]  See Lehman, 532 F.Supp.2d at 734 ("The WPCL does not provide relief for wages due under state or federal law[.]").

### 4.    Plaintiffs' Negligent Misrepresentation Claim

Defendants also contend that Plaintiffs have failed to plead a plausible claim of negligent misrepresentation.  (Def.'s Mot. at 18-22.)  In order to prove negligent misrepresentation under Pennsylvania law, a plaintiff must show:

> 1) a misrepresentation of a material fact; 2) the representor either knew of the misrepresentation, made the misrepresentation without knowledge as to its truth or falsity or made the misrepresentation under circumstances in which he should have known of its falsity; 3) the representor intended the misrepresentation to induce the plaintiff to act on it; 4) the plaintiff acted in justifiable reliance on the misrepresentation; and (5) injury resulted to the plaintiff.

Horizon Unlimited, Inc. v. Silva, 1998 WL 88391, at *4 (E.D.Pa. Feb. 26, 1998) (citing Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994)).

---

[9] We also note that Plaintiffs allege that Defendant had "a uniform policy requiring their distributors to pay for various operating expenses and costs," without reimbursing Plaintiffs. However, Plaintiffs do not allege that this "policy" violated any contractual provision for wages included in the Distribution Agreement.  (Am. Compl. ¶¶ 73-77; Pls.' Resp. at 12-14.)

Initially, we note that there is disagreement among the district courts within the Third Circuit regarding the pleading standard that applies to claims of negligent misrepresentation. Some courts have required plaintiffs to plead negligent misrepresentation in accordance with Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[10] Other courts, although declining to apply Rule 9(b), have held that a plaintiff must nonetheless "plead negligent misrepresentation with a degree of specificity."[11] We need not resolve this issue because an examination of the amended complaint reflects that Plaintiffs have not plead their claims with sufficient specificity even under the more lenient standard.

Plaintiffs allege that they "were purportedly hired by Defendants to work as 'independent contractors' and/or 'independent operators' pursuant to the terms of the Distribution Agreement[,]" although the Defendants "knew or should have known, at all times" that these "classifications in the Distribution Agreement were improper and that Plaintiffs and all other similarly-situated persons were 'employees[.]'" Plaintiffs further allege that "Defendants negligently misled Plaintiffs as to

---

[10] See  Esposito v. I-Flow Corp., 2011 WL 5041374 at *4 (E.D.Pa. Oct. 24, 2011) (holding Rule 9(b) applies to negligent misrepresentation claims); Hanover Insurance Co. v. Ryan, 619 F.Supp.2d 127, 142 (E.D. Pa. 2007) (same).

[11] See Brandow Chrysler Jeep Co. v. DataScan Tech., 511 F.Supp.2d 529, 537 (E.D.Pa. 2007) (holding that Rule 9(b) does not apply to negligent misrepresentation claims); In re American Investors Life Ins. Co. Annuity Mkgt. & Sales Practices Litiga., 2007 WL 2541216 at *31 (E.D.Pa. Aug. 29, 2007) (holding that Rule 9(b) does not apply to negligent misrepresentation claims, but noting that courts in this district generally require a "degree of specificity"); Floyd v. Brown & Williamson Tobacco Corp., 159 F.Supp.2d 823, 834 (E.D.Pa. 2001) (same) (citing Southern Seafood Co. v. Holt Cargo Sys., Inc., 1997 WL 539763, at *11 n.23 (E.D. Pa. Aug. 11, 1997)). But see Sims v. Viacom, Inc., 2009 WL 3856667 at *2 (E.D.Pa. Nov. 17, 2009) ("While fraud falls squarely within the heightened pleading standard required by Rule 9(b), claims of negligent misrepresentation are subject to notice pleading under Rule 8(a)").

their employment status, the products available for purchase and sale and Plaintiffs' business autonomy" and that Plaintiffs "relied upon these misrepresentations in deciding to sign the Distribution Agreement."  Plaintiffs contend that "[b]y its aforesaid conduct, Defendants are guilty of negligent misrepresentation for failing to take reasonable care in communicating to Plaintiffs that in fact all products would not be available for purchase and sale and that Defendants would regularly and consistently meddle in and control Plaintiffs' business affairs and that Plaintiffs would be treated as employees."  (Am. Comp. ¶¶ 105-20.)

However, Plaintiffs do not allege when these alleged misrepresentations were made, who made them, or how they were communicated.   It is also unclear whether these alleged misrepresentation were contained in the terms of the Distribution Agreement itself or in another oral or written statement by Defendants.  In essence, Plaintiffs allege that "certain misrepresentations were made by Defendants" at some point "prior to the signing of the Distribution Agreement." (Pl.'s Resp. at 19-20.)   Without more specific allegations regarding the nature of Defendants' misrepresentations or the circumstances surrounding these representations, we conclude that Plaintiffs have failed to plead their claims with the "degree of specificity" required.  See Floyd, 159 F.Supp.2d at 834 (E.D. Pa. 2001) (dismissing plaintiff's claim where "[t]he Complaint contained no allegations whatsoever concerning specific negligent misrepresentations").

## III.    MOTION FOR CONDITIONAL CERTIFICATION UNDER THE FLSA

Because we conclude that Plaintiffs have pled a plausible FLSA claim, we must also consider their motion for conditional certification.  Under the FLSA, plaintiffs may bring a "collective action" on behalf of "themselves and other employees similarly situated." 29 U.S.C. § 216(b).  To proceed in this manner, plaintiffs must first obtain conditional certification of their proposed class by making

a "preliminary showing" that they are "similarly situated" to potential class members.  Symczyk v. Genesis Healthcare Corp., 656 F.3d 189, 192-93 (3d Cir. 2011).

The United States Court of Appeals for the Third Circuit has held that to satisfy this requirement, plaintiffs must make a "modest factual showing" by "produc[ing] some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected [them] and the manner in which it affected other employees."[12]  In undertaking this analysis, "the merits of the plaintiffs' claims are not addressed."[13]  Bishop v. AT&T Corp., 256 F.R.D. 503, 507 (W.D.Pa. 2009).

Plaintiffs seek to bring this case on behalf of:

> All individuals who were designated by Defendants as "independent contractors" and/or "independent operators" whom pick-up fresh baked goods from the Mt. Laurel, New Jersey depot for delivery in Pennsylvania and New Jersey from 2007 to the present, and/or all individuals designated by Defendants as "independent contractors" and/or "independent operators" nationwide from 2007 to the present.

(Am. Compl. ¶ 16.)  Plaintiffs claim that the Defendants improperly designated these individuals as "independent contractors" and denied them certain benefits guaranteed to "employees" under the

---

[12] Id.; see also Wright v. Lehigh Valley Hosp., 2010 WL 3363992, at *3 (E.D.Pa. Aug. 24, 2010) (requiring modest factual showing "that the proposed recipients of opt-in notices are similarly situated to the named Plaintiff" but stating that such a standard is lenient and merely "requires some evidence beyond mere speculation that the defendant's policy affected other employees") (collecting cases); Parker v. Nutrisystem, Inc., 2008 WL 4399023, at *2 (E.D.Pa. Sept. 26, 2008) (citing Smith v. Sovereign Bancorp, Inc.,2003 WL 22701017, at *1 (E.D.Pa. Nov. 13, 2003) (joining Eastern District of Pennsylvania trend "to adopt the modest factual showing test" and emphasizing that the test, "although not automatic, is nevertheless 'an extremely lenient standard'")).

[13] A second determination follows discovery and is typically triggered by a motion to decertify.  Symczyk, 656 F.3d at 192-93 (citing Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1261 (11th Cir. 2008)).  "After discovery, and with the benefit of 'a much thicker record than it had at the notice stage,' [the] court . . . makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff.  'This second stage is less lenient, and the plaintiff bears a heavier burden.'"  Id.

FLSA, including minimum wage and overtime pay.  More specifically, Plaintiffs allege that, pursuant to a "nationwide policy," Defendants control these individuals as employees, but classify them as "independent contractors" to deny them the "benefits, rights and privileges owed to employees under the law."  Plaintiffs further contend that there is "modest" evidence in the record to reflect that they are "similarly situated" to these potential class members.  (Am. Compl. ¶¶ 16-26, 38-41; Pls.' Reply at 6-12.)

In independent contractor mis-classification cases such as the case before us, district courts are divided as to what type of evidence is relevant in considering whether the named and potential plaintiffs are similarly situated.  Some courts view the evidence of similarity in light of all of the factors used to determine whether an individual is an "employee" under the FLSA.[14]  In a second, different approach, other courts simply consider whether the plaintiffs have presented evidence of general similarities across the proposed class, including whether they share similar job responsibilities and work schedules or are uniformly classified as "independent contractors."[15]

---

[14] See e.g., Bamgbose v. Delta–T Group, Inc., 684 F.Supp.2d 660, 668 (E.D.Pa. 2010) (considering whether proposed class of individuals allegedly mis-classified as independent contractors were "similarly situated" with respect to analysis court "would engage in to determine whether workers are employees or independent contractors" and determining they were not similarly situated); Kerce v. West Telemarketing Corp., 575 F.Supp.2d 1354, 1360-61 (S.D.Ga. 2008) (considering evidence in light of factors relevant to establish "employee" status under FLSA, and concluding that plaintiffs were similarly situated to potential class members).

[15] See e.g., Johnson v. ECT Contracting LLC, 2010 WL 625390 at *3 (M.D.Tenn. Feb. 18, 2010) (holding that plaintiffs' evidence as to similarities in "job duties, training, and pay practices" was sufficient); In re Penthouse Executive Club Comp. Litig., 2010 WL 4340255 at *4 (S.D.N.Y. Oct. 27, 2010) (holding that plaintiffs' evidence of similar job title, job responsibility and work under same management to be sufficient); Labrie v. UPS Supply Chain Solutions, 2009 WL 723599 at *6 (N.D.Cal. Mar. 18, 2009) (holding that plaintiffs' evidence of similarities in job duties, nature of work, contract with defendant, hours worked and classification as "independent contractors" was sufficient); Houston v. URS Corp., 591 F.Supp.2d 827,  833-34 (E.D.Va. 2008) (holding that plaintiffs' evidence of similarities in job requirements, nature of the work, method of payment and status as "independent contractors" was sufficient).

Lastly, there are courts who borrow from each of these approaches, considering certain factors relevant under the FLSA "employee" test, such as whether the defendant "controls" or "supervises" class members in a similar manner, and evidence of general similarities throughout the potential class.[16]

We have examined these differing approaches to highlight the fact-specific nature of the "similarly situated" analysis as well as the court's broad discretion in determining whether the evidence establishes that plaintiffs and potential class members are sufficiently similar.  For purposes of our analysis, we will apply the third, combined approach.  We do so because this approach acknowledges the importance of the applicable legal standards under the FLSA regarding classifications as an "employee" as well as the other, broader factors considered in the second approach.  This combined approach also does not entail an evaluation of the merits of Plaintiffs' FLSA claims, which is inappropriate at this stage,  Bishop, 256 F.R.D. at 507.  For the following reasons and under this more expansive method of review, we conclude that Plaintiffs have made a "modest factual showing" to warrant conditional certification.

Plaintiffs first point to evidence that suggests that potential class members, as a general matter, have similar job duties and share a similar business relationship with the Defendants.

---

[16] See e.g., Spellman v. American Eagle Express, Inc., 2011 WL 4102301 at *1 (E.D.Pa. May 18, 2011) (holding plaintiffs' evidence that they worked as "couriers" and were subject to defendant's control and supervision and worked over forty hours a week was sufficient); Edwards v. Multiband Corp., 2011 WL 117232 at **1, 3-4 (D.Minn. Jan. 13, 2011) (holding similarities in payment method and defendant's control over scheduling and monitoring of work was sufficient); Westfall v. Kendle International, CPU, LLC, 2007 WL 486606 at **8-10 (N.D.W.V. Feb. 15, 2007) (holding that designation as "independent contractors" and similarities in hours worked, as well as evidence that defendants made their schedule, "instruct[ed]" them how to work, refuse to allow them to negotiate pay and provided them with equipment was sufficient).  Cf. Bamgbose, 684 F.Supp.2d at 668 (considering similarity in "skills, responsibilities, and experiences with [defendants] or its clients" in connection with the test for determining FLSA "employee" status).

According to Larry O'Neill, a "Distributor Liaison" who works for a subsidiary of Bimbo Foods Bakeries Distribution Inc., each delivery driver "owns the exclusive right to sell and distribute certain baked goods . . . in a defined geographical area." These drivers "purchase fresh baked goods . . . at various depots around the country, and then re-sell those products at a higher price to the [driver's] customers (e.g., grocery stores and convenience stores). The spread or 'margin' on those sales is one way that the [drivers] generate revenue." (O'Neill Dec., Doc. No. 23, ¶¶ 1, 3-4.)

Further, "[s]imultaneous with their purchase of sales and distribution rights, each [driver] enters into a Distribution Agreement" with Defendants or one of its affiliates. Id. ¶ 12. Plaintiffs contend that each of these Distribution Agreements are essentially the same. One similarity is that all drivers are classified as an "independent contractor" under the Agreement, which weighs in favor of conditional certification. See Westfall, 2007 WL 486606 at *9 (noting that classification of individuals as independent contractors is evidence of an overarching policy and "points toward the conclusion that the putative members of the collective action were subject to a single plan of the defendant"). Additionally, the applicable Distribution Agreements contained in the record are significantly similar, if not identical, in material respects.[17]

Although Larry O'Neill noted that there are a "number of different Distribution Agreements currently in place[,]" the differences in those agreements are not substantial. O'Neill simply noted that the differing terms pertain to "geographic location, when the agreement was signed, and which . . . affiliate[] is a party to the agreement." (O'Neill Dec., Doc. No. 23, ¶ 12.)

---

[17] See (Doc. No. 7, Exs. A-G, J-K) (reflecting that Distribution Agreement of named Plaintiffs contain minor differences, such as alternative definition of the term "chain," alternative language in § 3.5, "Purchase of Receivables," and as to whether § 2.5 regarding "Distribution Right Repurchase" and § 5.1 regarding "Best Efforts" are included); (Doc. No. 7, Exs. H-J) (reflecting that the Agreements of Plaintiff, Robert Dando, Sr., from 1988 and 1990 are different from the Agreements of other Plaintiffs, but that his 1997 Agreement is similar to the other Agreements of record, except for changes to the definitions of "outlet" and "products").

Plaintiffs also point to evidence that suggests that they and proposed class members work over 40 hours per week.  <u>See</u> (Kazarnowitz Dep. p. 221) (estimating he works between 50 and 60 hours a week out of Mount Laurel depot); (Ficcaglia Dep. p. 194) (estimating he works from 50 to 60 hours per week); (Sochacki Dep. pp. 140, 187-89) (reflecting that he works, on average, a little over forty hours per week); (Gagne Dep. p. 182) (reflecting he works 60 hours or more per week out of Texas depot).  <u>But</u> <u>see</u> (Pascale Dep. p. 32, 34, 36-37) (reflecting that he may work less than forty hours per week).  Although Defendants note that some potential class members work as "absentee" owners of their delivery routes or share work hours with others, overall, the similarities in the work hours of those deposed supports Plaintiffs' motion.  <u>See</u> (Defs.' Resp. 8-9.)

There is also evidence that Defendants' alleged "nationwide policy" of treating their drivers as "employees" under the FLSA, rather than "independent contractors," may be applied to Plaintiffs and potential class members in similar ways.  The FLSA broadly defines "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  In light of this "expansive definition[,]" the Third Circuit has developed a six factors analysis to determine whether a plaintiff is an "employee" under the FLSA:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending on his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

<u>Martin v. Selker Bros., Inc.</u>, 949 F.2d 1286, 1293 (3rd Cir. 1991) (citing <u>DialAmerica Marketing</u>, 757 F.2d at 1382).  In considering these factors, the court should also look to the totality of the circumstances and consider whether "as a matter of economic reality, the [plaintiffs] are 'dependent

upon the business to which they render service.'" Id.

The evidence of record reflects that there are similarities in the way Defendants allegedly "control" Plaintiffs and potential class members.  Plaintiffs have testified that, although they retain the right to return unsold products for credit within a certain time frame, Defendants have "audited" their returns, without consent, and charged them for "stale" products while working at the Mount Laurel depot.[18]  Plaintiff, Robert Dando, Sr., testified that audits were also being performed at the New Castle, Delaware, depot and Plaintiff, Quinn Scott, testified that a driver from Texas told him that Defendants "threatened" them with "audits."  (Dando, Sr., Dep. p. 98; Scott Dep. pp. 140-42.) Further, opt-in Plaintiff, James Wills, III, testified that he was subject to such audits working at a Texas depot.  (Wills Dep. p. 190.)

Similarly, there is evidence that Defendants have a "policy" of assessing "fines" against Plaintiffs and proposed class members for "violations" of procedures dictated by the stores on their routes.  See (Ficcaglia Dep. p. 82) (testifying that it was the "company's policy" of "withdrawing the money from our settlements" for "fines from different stores"); (Sochacki Dep. pp. 255-56) (testifying that "if a store fines you, [Defendants] take that deduction" from their pay).  Cf.  (Gange Dep. pp. 97-99) (testifying that he was cited by Defendants for not having an item in stock at a Texas depot); (Dando, Sr., Dep. pp. 71-72, 78) (testifying that drivers are cited for not having certain items in stores or not displaying them in certain ways).

Plaintiffs and potential class members working out of the Mount Laurel, New Jersey, and

---

[18] See (Kazarnowicz Dep. pp. 256-57) (testifying that he was audited "five or six times" and charged him for products, without being present); (Dando, Sr., Dep. p. 253) (testifying that "they are doing audits on our stale" and "charging us back" for the products, without consent); (Scott Dep. pp. 139-40) (testifying that he was subject to audit, due to excessive "stale" returns); (Davenport, III, Dep. p. 163) ("Charging back money for those stale audits which happens on a regular basis is not part of the sales agreement").

New Castle, Delaware, depots also testified that Defendants exercise control over the products they can distribute.  See (Sochacki Dep. pp. 32-33) (testifying that he was not allowed to sell particular products at Mount Laurel depot); (Ficcaglia Dep. pp. 120-21) (testifying that he was unable to order certain products at Mount Laurel depot); (Scott Dep. pp. 80-81) (testifying that "we were locked out of many" products at Mount Laurel depot); (Pascale Dep. p. 242) (testifying that he was "locked out" of certain products around holidays in New Castle depot).  Relatedly, opt-in Plaintiff, Raymond Gagne, testified that Defendants have taken "responsibility" for ordering product "out of [his] hands" at the Texas depot with a computer system that provides suggested orders.  (Gagne Dep. pp. 112-13) (testifying that Defendants use a computer system, called PROMPT, to control his product orders at Texas depot.  But see (Wills Dep. pp. 151-53) (testifying that PROMPT system provides recommendations, which can be changed).

Lastly, there is evidence that Defendants control the profitability of Plaintiffs and potential class members.  Under the Distribution Agreement, Defendants serve as the "agent" of their deliver drivers for the purposes of pursuing business opportunities and negotiating prices with "chains." (Doc. No. 7, Exs. A-G, J-K, § 5.2.)  Although Defendants' status as agent is "revocable" under the Agreement, Defendants may in reality retain exclusive control on this issue. In an email to a driver who sought to negotiate with a "chain" on his own, Defendants' Distributor Liaison, O'Neill, stated that "customer chain stores will not likely deal with you directly on the subject of promos, invoices and the like."  (Doc. No. 50, Ex. J.)  In addition, the Distribution Agreement also requires Plaintiffs and potential class members to service chains that are not profitable in their sales area, as long as that chain is "profitable as a whole."  (Doc. No. 7, Exs. A-G, J-K, § 4.1.)  Plaintiff, Robert Dando, Sr., testified that individuals at the Mount Laurel and New Castle depots were unable to stop servicing unprofitable chain stores in their area, pursuant to this provision.  (Dando, Sr., Dep. pp. 68-69.)

In light of the evidence reviewed above, we conclude that Plaintiffs have made a modest factual showing that Defendants' policies affected the employment of both the named Plaintiffs and potential class members.  In reaching this conclusion, we acknowledge that Defendants have pointed to several individual differences between Plaintiffs and the proposed class members, including their own use of "employees" or "helpers" and their individual opportunities to generate profits.  (Defs.' Resp. at 9-14.)  Defendants have also noted that certain FLSA exemptions may apply to bar certain individual Plaintiffs and potential class members from collecting under the FLSA.  (Defs.' Resp. 25-28.)  However, at this preliminary stage of the case, these differences among proposed class members and the potential impact of FLSA exemptions do not undermine Plaintiffs' modest factual showing.  See Westfall v. Kendle International, CPU, LLC, 2007 WL 486606 at *9 (N.D.W.V. Feb. 15, 2007) (holding that arguments regarding individual differences among class members, which are relevant to their status as "employees" under the FLSA, are better suited for second stage of the similarly situated analysis); Jirak v. Abbott Laboratories,566 F.Supp.2d 845, 849-50 (N.D.Ill. 2008) ("[T]he application of an FLSA exemption is an affirmative defense on which Defendant carries the burden of proof . . . [and] whether [plaintiffs] are exempt from the FLSA cannot be determined based on the limited record developed at this stage") (citations omitted).[19]

IV.     **SUPPLEMENTAL JURISDICTION**

Although not raised by the parties, Plaintiffs' simultaneous pursuit of class claims under the FLSA and PMWA raises a question as to whether supplemental jurisdiction should be exercised pursuant to 28 U.S.C. 1367(c)(4).  Under this section, we may decline to exercise supplemental

---

[19] Plaintiffs also request that we approve their proposed notice form to be sent to potential class members so that they can determine whether they will opt-in to the litigation.  Rather than accepting Plaintiffs' proposed form, we conclude that it is best to first order the parties to meet and confer to attempt to devise a notice form that both sides find to be fair and accurate.  The Court will, if necessary, then consider and resolve any disagreements that cannot be resolved.

jurisdiction for "compelling reasons."[20]

Our review of precedent on this issue reflects a lack of consensus amongst district and circuit courts as to whether it is appropriate to exercise supplemental jurisdiction where parallel federal and state claims are brought under different procedural mechanisms.  In particular, under 29 U.S.C. § 216(b), which applies to FLSA collective actions, plaintiffs must affirmatively opt-in to the collective action.  Conversely, under Federal Rule of Civil Procedure 23, which applies to state class action claims, plaintiffs are automatically enrolled in the class action unless they affirmatively opt-out.  The Third Circuit has not yet been presented with this specific issue.[21]

Several district courts within the Third Circuit have concluded that the FLSA opt-in mechanism and the Rule 23 opt-out mechanism for supplemental state law claims are "inherently incompatible" and offer a compelling reason to decline jurisdiction.  See, e.g., Woodard v. FedEx Freight East, Inc., 250 F.R.D. 178, 182-83 (M.D.Pa. 2008) (declining to exercise supplemental jurisdiction under 1367(c)(4) and concluding that "where a plaintiff asserts an FLSA collective action and a state law Rule 23 class action, both of which are predicated on the same facts and seek to vindicate identical statutory rights, but the state law lacks an opt-in requirement, the simultaneous prosecution of these claims will undermine the objectives Congress sought to achieve by amending

---

[20] There is no question that this case arises "from the same case or controversy," as required under 28 U.S.C. § 1367(a).

[21] In De Asencio v. Tyson Foods, Inc., the Third Circuit did consider whether it was appropriate for a district court to exercise supplemental jurisdiction over a Rule 23 class action based upon the WPCL, where the plaintiffs were also pursuing an FLSA collective action.  342 F.3d 301, 309-12 (3d Cir. 2003).  The Court held that it was an abuse of discretion for the district court to exercise supplemental jurisdiction over the class action, because the state law claims raised novel issues of state law and the state claims substantially predominated over the federal claims at issue.  Id.  The Court did not address the state statute at issue in this case, the PWCL, or determine whether the FLSA's "opt-in" procedure and Rule 23's "opt-out" procedure provide a district court with a sufficient basis to decline supplemental jurisdiction.

section 216(b) to require written consent to become party plaintiffs to FLSA actions."); Ramsey v. Ryan Beck & Co., 2007 WL 2234567, at **2, 4 (E.D.Pa. Aug. 1, 2007) (finding that "FLSA collective actions are inherently incompatible with Rule 23 state-law class actions, and thus cannot be brought simultaneously in federal court under one lawsuit" and further determining that "to exercise supplemental jurisdiction over [the] state-law class action would be an abuse of discretion" where novel and complex issues have not yet been addressed by the Pennsylvania courts).

Several circuit courts, however, have rejected the argument that these claims are inherently incompatible, and in the alternative, have concluded that these types of claims may proceed concurrently.  See Shahriar v. Smith & Wollensky Rest. Grp., 659 F.3d 234, 249-50, 253 (2d Cir. 2011) (finding no abuse of discretion in district court's decision to exercise supplemental jurisdiction and affirming class certification of state law claims); Ervin v. OS Rest. Servs., Inc., 632 F.3d 971, 980 (7th Cir. 2011) (concluding that "while there may in some cases be exceptional circumstances or compelling reasons for declining jurisdiction, the 'conflict' between the opt-in procedure under the FLSA and the opt-out procedure under Rule 23 is not a proper reason to decline jurisdiction under section 1367(c)(4)"); Wang v. Chinese Daily News, Inc., 623 F.3d 743, 760 (9th Cir. 2010) (holding that "the district court acted within its power and did not abuse its discretion in choosing to exercise supplemental jurisdiction" where FLSA claims were brought concurrently with state wage and hour claims); Lindsay v. Gov't Emps. Ins. Co., 448 F.3d 416, (D.C. Cir. 2006) ("We do not view the difference between the opt-in procedure provided by section 216(b) for FLSA claims and the opt-out procedure for state law claims provided by Rule 23 as fitting the 'exceptional circumstances'/'other compelling reasons' language of section 1367(c)(4)" and further stating that "[w]hile there is unquestionably a difference . . . between opt-in and opt-out procedures, we doubt that a mere *procedural* difference can curtail section 1367's *jurisdictional* sweep").

We find persuasive the Second Circuit's analysis in <u>Shahriar</u>, which rejected the argument that FLSA opt-in actions are inherently inconsistent with parallel state law opt-out actions.  <u>See</u> <u>Shahriar</u>, 659 F.3d at 247-48.  The <u>Shahriar</u> court reasoned that "nothing in the language of the FLSA prevents the exercise of supplemental jurisdiction over Plaintiffs' state law wage claims." <u>Id.</u> The court also correctly noted that Congress did not expressly prohibit the exercise of supplemental jurisdiction in the FLSA, which it is permitted to do under the doctrine of express preemption. The court stated that it "did not read the plain language of § 216(b) as restraining any remedies available to employees under state law or as affecting a federal court's ability to obtain supplemental jurisdiction over state employment actions." <u>Id.</u>

Further, the <u>Shahriar</u> court recognized the FLSA's savings clause, which "makes clear that states may enact wage laws that are more protective than those that are provided in the act." <u>Id.</u>  This clause provides:

> No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter.

29 U.S.C. § 218(a).  Thus, the FLSA creates a floor from which states can act, not a ceiling.

Finally, the <u>Shahriar</u> court noted that the legislative history of the FLSA's opt-in provision, which was added to the FLSA in 1947 through the Portal-to-Portal Act, "provides no support for precluding joint prosecution of FLSA and state law wage claims in the same federal action." <u>Shahriar</u>, 2011 WL 4436284 at *10.  We conclude, therefore, consistent with the Second, Seventh, and D.C. Circuits, that "while there may in some cases be exceptional circumstances or compelling reasons for declining jurisdiction, the 'conflict' between the opt-in procedure under the FLSA and the opt-out procedure under Rule 23 is not a proper reason to decline jurisdiction under section

1367(c)(4)." Ervin, 632 F.3d at 980.

We acknowledge, however, that the supplemental jurisdiction question is "case-specific," and requires an examination of "the scope of the state and federal issues, the terms of proof required by each type of claim, the comprehensiveness of the remedies, and the ability to dismiss state claims without prejudice to determine whether the state claim constitutes the real body of the case." De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 312 (3d Cir. 2003).[22] Facts developed during the course of discovery could implicate these factors and impact the court's supplemental jurisdiction analysis. Consequently, although we will maintain jurisdiction over the PMWA claims, Defendants may, if they deem appropriate, seek dismissal of these claims on supplemental jurisdiction grounds at the close of discovery, based upon a complete picture of the class-based claims at issue.

## V.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part, such that Plaintiffs' WPCL and negligent misrepresentation claims are dismissed. In addition, Plaintiffs' Motion for Approval of Notice to Potential Class Members and for Approval of Form of Preliminary Class Notice and Consent to Opt-In Form is granted.

Our Order follows.

---

[22] This possibility was recognized in the recent case of Pridgen v. RAB Communications, 2011 WL 5920932 at **2-3 (D.N.J. Nov. 28, 2011), where the court declined to address supplemental jurisdiction and the "inherent incompatibility" argument at the motion to dismiss stage.